**HUNT FOODS, Inc., a Corporation,**
**Appellant,**

v.

**Wellington PHILLIPS and H. W. Liholm,**
**Appellees.**

**No. 15216.**

United States Court of Appeals
Ninth Circuit.

Aug. 7, 1957.

Rehearing Denied Oct. 11, 1957.

Cushing, Cullinan, Duniway & Gorrill, San Francisco, Cal., for appellant.

Hancock, Elkington & Rothert, San Francisco, Cal., for appellees.

Before STEPHENS, Chief Judge, and HEALY and POPE, Circuit Judges.

STEPHENS, Chief Judge.

In this diversity case, appellees Wellington Phillips and H. W. Liholm, partners doing business under the name of Wellington Phillips & Co., seek damages for breach of contract. In 1951 appellees were engaged in the business of bidding for sales of canned goods and other products to military purchasing offices in California. Appellee Phillips was the chief moving force behind the partnership, having had some twenty-five years experience in various aspects of the grocery and canned food business. The appellees' bidding business in 1951,

although fairly new, was profitable, and the outlook for the future was bright. Phillips, in August and September, 1951, talked to Mr. Flynn, Hunt Foods' Sales Manager for the Northern California District, as to the possibility of exclusively handling Hunt's products in the military commissaries. Various discussions later took place between Phillips, Flynn, Mr. Miller, District Sales Manager for all districts of Hunt Foods, Mr. Reed, Export and Government Supply Manager, and Mr. Church, Credit Manager for Hunt Foods. It was disputed at the trial as to the gist of those conversations. Phillips had critical discussions with Mr. Flynn, who was deceased at the time of the trial. Phillips alleged that he told Flynn that his then bidding business in 1951 was very profitable and he would earn $15,000 profit that year; that he told Flynn that he would be willing to act as jobber in sales of Hunt Foods products to the military commissary stores in Northern California if such appointment were exclusive and that he would sell no other brand of canned food products to such commissary stores. Phillips said he told Flynn that because Hunt Foods salesmen were presently selling at wholesale prices to the commissary stores, that it would take him a period of time to obtain a profit for himself on the resale of such products to the stores until changing market conditions or general price changes made it feasible to add or create a mark-up or percentage of profit for himself. Hunt Foods products were then selling considerably below the price of other brands for the same quantity, and it was the intention of Phillips to eventually obtain a fair profit margin by increasing the resale price of Hunt products more than would be done by competitors when there was a price increase, and to decrease Hunt resale prices less than the decrease of competitors when there was a general price decline. In both situations Hunt products would still be selling below that of competitors.

Phillips said he told Flynn that it would take two or three years to make up for early losses while he was building up sales and gradually increasing the resale price of the goods. Phillips said that Flynn agreed that Hunt salesmen would no longer sell to the commissaries, but that they would receive sales credit for all sales made by Phillips. Phillips said Flynn told him such arrangement was acceptable to him as District Sales Manager and that Phillips should talk to Mr. Miller, District Sales Manager for all districts, at the company's principal office at Fullerton, California. Phillips contacted Miller, who stated that any arrangements made by Flynn were acceptable to him. Phillips also arranged with Mr. Church, Credit Manager of appellant, for a certain amount of credit.

In November, 1951, Mr. Flynn signed and distributed, to Hunt salesmen in his area and to military commissaries, a letter confirming the appointment of Phillips as exclusive military service jobber.

Phillips commenced promotion and sales of Hunt products in December, 1951, and continued the jobber arrangement until April, 1953, at which time Hunt informed Phillips that it was terminating the arrangement. It was not disputed that, during the period of the arrangement, the sales of Hunt products to the military commissaries was doubled. The arrangement Hunt had with Phillips was unique, and Hunt had no similar arrangement with anyone else. Hunt terminated the arrangement with Phillips and turned over its entire nationwide sales to military commissaries to a nationwide firm.

Phillips, during the existence of the arrangement, did not promptly pay to Hunt all sums owing, for goods sold by Phillips and charged to him. But Hunt apparently was satisfied with the increased sales, and therefore did not press Phillips too hard as to credit problems. When Hunt did terminate the agreement, Phillips owed Hunt approxi-

mately $25,000. After the termination, Phillips made payments to Hunt so that by July, 1953, he owed Hunt $13,319.37. Phillips then signed three written promises to pay, called trade acceptances, each in the sum of $4,439.79, representing the balance due to Hunt. Phillips paid $1,824.21 on the first trade acceptance, but the balance of the trade acceptance was never paid, nor were payments ever made on the other two acceptances. Phillips admitted liability on the acceptances for the balance of $11,495.16.

In November, 1954, Phillips sued Hunt Foods for breach of the oral contract. Hunt Foods also filed a counterclaim and cross-complaint seeking $11,495.16, based on the balance owing on the three trade acceptances signed by Phillips.

A non-jury trial was had in the District Court. The trial judge found that an oral agreement was entered into between the parties for an unspecified period of time commencing on December 1, 1951. The Court further held that Hunt Foods, Inc. violated and breached the oral agreement and awarded damages of $21,500 to appellees. Judgment was rendered in favor of appellant on its cross-complaint for $11,495.16, being the admitted balance then due and owing on the three trade acceptances signed by Phillips. Hunt Foods, Inc. appeals from the judgment.

### The Appeal

■ First, appellant argues that when the trial court rendered judgment in its favor for $11,495.16 on its cross-complaint, the Court should have allowed attorneys' fees, interest and costs. The award to appellant was based on the then past due trade acceptances. Appellees, in their answer to the cross-complaint, admitted acceptance of the three trade acceptances and the correctness of the balance due and owing. There was no issue in the case relating to the admitted liability of appellees upon such trade acceptances. It is apparent that the attorneys' fees and costs incurred by appellant were incurred in defending against the demands of appellees' complaint. We find no error in the action of the trial judge in not awarding costs or attorneys' fees under the circumstances of this case.

■ The question whether Hunt Foods should have been allowed interest on the trade acceptances from date of maturity is another matter. California law is here controlling as to this issue since the trade acceptances were executed in California and were to mature and be payable in California.

California Civil Code, § 3287 provides:

"§ 3287. *Interest on damages; right to recover; time from which interest runs*

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including any political subdivision of the State. (As amended Stats.1955, c. 1477, p. 2689, § 1.)"

■ The amount due appellant was liquidated and was represented by the three trade acceptances. Under California law, if appellant had sued appellees on the acceptances, appellant would have been entitled to interest from the date of maturity of each of the acceptances. Hansen v. Covell, 1933, 218 Cal. 622, 24 P.2d 772, 89 A.L.R. 670; California Lettuce Growers v. Union Sugar Company, 1955, 45 Cal.2d 474, 289 P.2d 785, 49 A.L.R.2d 496. But appellees argue that the trade acceptance obligation is completely offset by the trial judge's award of $21,500 to them as damages for breach of contract, and therefore the interest on the trade acceptances was properly omitted by the trial court. Appellees do not here claim that they are entitled to interest on their award prior to judgment. It is obvious that appel-

lees' claim for damages was an unliquidated claim; and, under California law, they would not have been entitled to interest prior to judgment. We are thus presented with a liquidated claim being asserted by appellant and an unliquidated claim being asserted by appellees in defense. The following quotation in Hansen v. Covell, 24 P.2d 772, 775, is pertinent:

"On the theory that a debtor may not defeat the creditor's right to interest on a liquidated sum by setting up an unliquidated claim as an offset, the result reached in the case of Pearson v. Ryan, 42 R.I. 83, 105 A. 513, 3 A.L.R. 805, has been applied in a number of jurisdictions. In a note to that case in 3 A.L.R. p. 809 et seq., the general rule is stated that: 'Where the amount of a claim under a contract is certain and liquidated, or is ascertainable but is reduced by reason of the existence of an unliquidated set-off or counterclaim thereto, interest is properly allowed on the balance found to be due from the time it became due. * * *' California is credited with having adopted that doctrine in the case of McCowen v. Pew, 18 Cal.App. 482, 123 P. 354, 355. The trial court in the present case applied the rule, which is also stated in the same note, that where the plaintiff's demand is liquidated the plaintiff is given interest on the full amount and the defendant's unliquidated demand is treated as a discount and not as a payment. See Smith v. Turner, 33 Or. 379, 54 P. 166; note 3 A.L.R. at pages 812, 813 and cases cited. *The latter principle, however, appears to be applicable in cases where the claim for deduction could not be said to be demandable at the time when the original liquidated claim became due, but was rather the proper subject of a counter claim for damages than of an offset in the nature of a payment.*" (Emphasis supplied.)

It is also said in California Lettuce Growers v. Union Sugar Company, 289 P.2d 785, 793, that

"The prevailing party is entitled to interest on the amount of his judgment where the damages are certain, or capable of being made certain by calculation, and the right of recovery is vested in him upon a particular day. Civ.Code § 3287. California Lettuce correctly contends that the mere pleading of unliquidated counter claims does not render unliquidated an otherwise certain or determinable debt owing to the plaintiff. *The unliquidated counter claims are given treatment as discounts, not as payments made at the time the debt is due. * * *"* (Emphasis supplied.)

The italicized portion of the above quotation has exceptions though. See Hansen v. Covell, supra; Muller v. Barnes, 139 Cal.App.2d 847, 294 P.2d 505, 506; San Diego Fruit & Produce Co. v. Elster, 127 Cal.App.2d 80, 273 P.2d 70, 75; Union Sugar Co. v. Hollister Estate Co., 3 Cal.2d 740, 47 P.2d 273, 280.

In the instant case we find no such exception. The case of Mall Tool Co. v. Far West Equipment Co., 45 Wash.2d 158, 273 P.2d 652, 663, (not cited in either brief), we find analogous to the instant case. There a manufacturer sued a distributor who failed to pay for goods sold to the distributor. The distributor filed a cross-complaint for commission on sales made by the manufacturer through others in the distributor's protected territory. The distributor admitted liability as to the value of the goods delivered but argued that the amount of the award of damages to him for breach of the exclusive distributorship should be subtracted from the amount due the manufacturer before interest was figured. The Court made the following comments:

"There is a rule, however, applicable under certain circumstances, that the amount found to be due on

a liquidated or determinable claim may be reduced by the amount found to be due on an unliquidated counterclaim or setoff, and that interest will be allowable only on the balance remaining after the reduction has been made. This rule is applicable only when the amount to which a defendant is entitled as a counterclaim or setoff is for defective workmanship or other defective performance by the plaintiff, of the contract on which his liquidated or determinable claim is based, of a character such that the award of damages as compensation is regarded as constituting either a reduction of the amount due the plaintiff or a payment to him. This is on the theory that the plaintiff is entitled to interest only on the amount of which he has been deprived of the use during the period of default * * *.

\* \* \* \* \* \*

"In the instant case, if Far West were claiming that defective workmanship in the saws made them unsaleable or reduced their value, or resulted in a need for repairs to make them saleable or in other damage, we would have a basis for the application of the above rule. But Mall's breach of its exclusive distributorship contract with Far West involved a separate (bilateral) feature of the contract and had nothing directly to do with the sale of goods, wares, and merchandise to Far West or the amount due therefor. The damages to which Far West is entitled for sales made in its protected territory would reduce the amount of the judgment which Mall is entitled to recover in this action, but those damages would not in any way affect Mall's right to interest prior to judgment on its claim for goods sold and delivered at an agreed price."

We hold that the District Court should have allowed interest on the three trade acceptances from the date of their maturity. See cases cited in the margin in accord with the result we herein reach.[1]

### Termination and Mutuality

Appellant argues that the arrangement with appellees was terminable at will and that the parties merely hoped that the arrangement would be mutually successful and would continue. The trial court took the view, based on the evidence, that appellant appointed appellees as exclusive military service jobber for an unspecified period of time and that before a reasonable time had elapsed, appellant unfairly terminated the contract. The trial court stated that J. C. Millett Co. v. Park & Tilford Distillers Corp., D.C.N.D.Cal., 123 F.Supp. 484, 492, was not substantially dissimilar to the instant case. The Millett case involved a determination of the relationship of the parties under an oral agreement whereby plaintiff bought defendant's products as a wholesaler and resold them to retail outlets. In a well-reasoned opinion the court made the following comment in regard to the nature of the distributorship contract which we hold is applicable to the instant case.

"The distributorship contract in the case at bar is more than a contract of employment or agency. It is also a contract of sale. On the other hand, it is more than a mere sales contract. It partakes of the substantial aspects of both.

"At least one California case has applied the California rule pertaining to sales contracts of indefinite duration, i. e., that the party seeking to terminate must give the other party reasonable notice thereof and such termination cannot be effected until at least a reasonable time has expired, to a contract in which plaintiff agreed to buy and exploit.

1.  Morse v. Ellerbe, 1851, 4 Rich, S.C., 600; Rogers v. Russell, 1817, 1 Nott & McCord, S.C., 24. See also the annotation in 3 A.L.R. 809; and 14 Cal.Jur.2d §§ 76 to 86.

in California the warehouse receipts of defendant's distillery. The distributorship contract viewed as a contract of sales would require this result here.

"What of the contract's agency aspects? The California Courts hold that where a contract of employment or agency for an indefinite period is based on some consideration other than the services to be rendered it will continue for a reasonable period of time. While there is some conflict regarding contracts for permanent employment based on such independent consideration it is clear that they likewise continue for at least a reasonable period of time. The other consideration need not be unrelated to the services to be performed. The requirement is that the consideration be *other than the service to be rendered as an employee or agent.*

"The agency aspects of the distributorship contract required Millett to use its corporate best efforts to promote the sale of Park & Tilford products and to sell such products to the retail market. But in addition Millett agreed to and did buy Park & Tilford products, took title to them and thus assumed the risk of their destruction, maintained warehouse facilities and tied up a substantial amount of its capital in inventory and accounts receivable. While these functions are related to the services to be rendered they are not the aspects of the distributorship contract which are properly called agency. Factually, the agreement was an integrated whole. But for purposes of determining the applicability of the Speegle case [Speegle v. Board of Fire Underwriters, 1946, 29 Cal.2d 34, 172 P.2d 867] the agency character of the relationship must be separated from its sales character. In my opinion the non-agency undertakings are sufficient additional consideration."

Appellant argues that in the instant case there is no independent consideration. However, the trial court held in Finding of Fact V that:

"During the period from December 1, 1951, to the month of May, 1953, plaintiffs did substantially abandon plaintiffs' activity in said former bidding business in order to fully promote the sales of defendant's products during said period and in order to perform said oral agreement and did sell large quantities of defendant's products to said military installations at about plaintiffs' costs and without substantial gross profit."

■ We hold that there was consideration other than the service to be rendered as an employee or agent. For a concise summary of the law on this point, see Jack's Cookie Company v. Brooks, 4 Cir., 227 F.2d 935. Appellees curtailed substantially their then existing bidding business in order to devote time and effort to the exclusive jobber contract. Appellees (with the understanding and knowledge of Hunt) agreed to sell appellant's products for a year or two without substantial profit. Appellees likewise maintained a stock of goods in inventory and agreed to refrain from selling competing lines to the commissaries. Thacker v. American Foundry, 78 Cal.App.2d 76, 177 P.2d 322, 327, cited by appellant, is inapposite to the instant case, since in that case, the evidence indicated that the employee's prior position as an expediter "was terminating because of the completion of its plant and that he would have to look for a job." Also in the Thacker case, the plaintiff did not allege any consideration which would have enabled the court to find any contract other than one terminable at will. Ruinello v. Murray, 1951, 36 Cal.2d 687, 227 P.2d 251, is also of no aid to appellant since in that case the plaintiff did not allege any consideration which would indicate that the employment he gave up was anything other than an employment terminable at will. Ford Motor Co. v. Kirkmyer Mo-

tor Co., 1933, 4 Cir., 65 F.2d 1001, is clearly distinguishable when read in its entirety and not out of context as done by appellant in its brief. The oral contract therein involved was held to be lacking in mutuality and too indefinite to form the basis of a binding obligation. The alleged oral contract referred to and inferentially incorporated a written contract, but it was pointed out that the written contract was terminable at will and also did not obligate the defendant to deliver a single car or truck. E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 228, 89 A.L.R. 238, likewise is inapposite since it was therein held that under the contract "the Reno Company was in a position at any time to terminate the contract without incurring any liability therefor," and therefore the contract lacked mutuality and was terminable at will.

We likewise hold that the contract is not terminable at will because of lack of mutuality. We have already somewhat discussed this issue, but we now answer specific points raised by appellant. First, appellant argues that there is lack of mutuality because appellees were free to somewhat continue their brokerage business. In support of this argument, appellant cites Hoffmann v. Pfingsten, 1951, 260 Wis. 160, 50 N.W. 2d 369, 372, 26 A.L.R.2d 1131, wherein by dictum the court substantiated its holding of lack of mutuality (because under the modified contract Hoffmann made no promise to order the product) by pointing out that "Hoffmann had no obligation to give all his time to 'Old Tanner' *nor* to prosecute its development vigorously * * *." (Emphasis supplied.) Under the contract in the instant case, appellees agreed to do more than refrain from handling competitive products. They agreed to service the various military establishments, to depart from their existing bidding business, and to sell the line without profit for a year or two. In J. C. Millett Co. v. Park & Tilford Distillers Corp., D.C., 123 F.Supp. 484, 490, it is stated:

"It is clear that Millett promised to do more than buy whatever amount of liquor it desired. In promising to take on the distributorship, it promised to perform the essential economic function of that position, i. e., to use its corporate best efforts to promote the sale of Park & Tilford products. * * *

"The fact that Millett was in contemplation of both parties to sell other distillers' products does not mitigate against its covenant to use its best efforts. * * *"

It is clear that appellant's representatives knew and acquiesced in appellees continuing their prior brokerage business. In fact, it is obvious that the parties intended that the brokerage business was to continue on a somewhat reduced scale until such time as appellees' sales of Hunt products enabled them to discontinue the prior business entirely. Finding of Fact IV is in accord with this view and is not clearly erroneous.

We find without merit the second argument of appellant that the contract lacks mutuality because appellant could not force appellees to buy any goods. Appellees were the exclusive jobber of appellant's products to the military establishments in Northern California, and appellees were obligated to use their best efforts to promote the sales of appellant's goods. If appellees failed to use their best efforts, appellants could maintain an action against appellees for breach of contract. E. I. Du Pont De Nemours & Co. v. Claiborne, supra, is inapposite as previously discussed. Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451, 452, is distinguishable since the court construed the negotiations of the parties as resulting only in "a series of separate and independent sales, each complete in itself, and each consisting of its individual order, accepted and the sale completed on the part of defendant by delivery of the merchandise." The court likewise found no consideration or hardship or unfairness calling for application of Restatement of the Law of Contracts § 90.

Other cases cited by appellant are either not persuasive or inapposite.

## Reason for Termination

The trial court held in Finding of Fact VII that appellees "duly and fully performed each and all of the obligations" under the oral contract and the trial court did not agree with appellant's claim that the termination was because Phillips had not promptly paid for the goods delivered upon Phillips' account. We can not substitute our judgment for that of the trial court.

## Statute of Frauds

Appellant argues that the California Statute of Frauds[2] is a defense to this action because the alleged oral contract was to continue for more than one year.[3] The trial court held that recovery is not prevented by the statute of frauds, basing its decision on appellant being estopped to assert the statute.[4] The trial court construed the oral contract to be one that was to continue for a reasonable time and that "long before a reasonable time had elapsed, Hunt unfairly terminated the contract." The court held that the contract commenced December 1, 1951, and was breached by appellant on April 25, 1953.

The applicable California law on estoppel to assert the statute of frauds is succinctly set forth in Berkey v. Halm, 101 Cal.App.2d 62, 224 P.2d 885, 889, wherein it is stated:

"Where a party to an oral contract has been induced by the other party seriously to change his position in reliance upon, or in performance of, the contract, and would suffer an unconscionable injury if it were not enforced, or if unjust enrichment would result if a party who has reaped the benefit of the other's performance were allowed to rely upon the statute, the doctrine of estoppel will be invoked and the statute of frauds will not be available to perpetuate the fraud. Where either an unconscionable injury or unjust enrichment would result from refusal to enforce the contract, the doctrine will be applied whether or not plaintiff relied upon representations that a writing is not necessary or will be executed or that the statute will not be relied upon as a defense. Monarco v. Lo Greco, 35 Cal.2d 621, 220 P.2d 737. The Monarco case is the latest expression of the Supreme Court on the subject." See Fibreboard Products v. Townsend,

---

2. California Civil Code, § 1624(1) requires that an oral contract not to be performed within one year of the making must be in writing. See also California Code of Civil Procedure, § 1973 (1).

3. Because the trial court held that the contract was for a reasonable time and the reasonable time had not yet elapsed, some sixteen months after the commencement date, it is apparent that the contract is within the statute of frauds, being more than one year in duration. See concurring opinion by Judges Pope and Healy in Fibreboard Products v. Townsend, 9 Cir., 202 F.2d 180. Hopper v. Lennen & Mitchell, 9 Cir., 146 F. 2d 364, is an accord with this view. J. C. Millett Company v. Park & Tilford Distillers Corp., D.C., 123 F.Supp. 484, is not inconsistent with our view since in that case it was held that if notice of termination was given at the earliest

possible moment, performance could be completed within one *year*.

4. The trial judge in his Order for Judgment, stated that there was an oral contract "evidenced by some written memoranda." But it is apparent that his basis for not applying the statute was estoppel. Appellees' counsel, in his opening statement, argued that appellant was estopped to assert the statute. The trial judge also stated that another judge was correct in denying a pre-trial motion to dismiss because of the statute of frauds and that the question before him at the close of the trial was whether the evidence presented was sufficient to sustain the contention of estoppel. We do not discuss whether there was a memorandum signed by the party to be charged sufficient to take the contract out of the statute. See California Code of Civil Procedure, § 1973.

9 Cir., 202 F.2d 180, where this Court found an estoppel on the basis of the Monarco case. For a discussion of the Monarco case, see 3 Stanford Law Review, page 281.

In the instant case the trial court found that appellees agreed to promote the sale of appellant's food products and to perform the duties and obligations of exclusive military service jobber, representative and agent for defendant in sales to military stations, camps, posts, post exchanges and other military installations in Northern California. The trial court also held that appellees informed appellant that in order to fully promote and increase the volume of sales of appellant's products, appellees would (1) for approximately two years, sell appellant's products to the military installations at about appellees' costs, and without substantial profit and would expect and plan to sell appellant's products at a normal profit after the elapse of approximately two years from the commencement of the performance of the oral contract, and (2) appellees would decrease and eventually abandon appellees' activity in appellees' prior business of bidding for military purchases of various products sold by plaintiffs prior to December 1, 1951. The trial court also held that during the period December 1, 1951, to May, 1953, appellees did substantially abandon appellees' activity in the former bidding business in order to fully promote the sales of appellant's products and to perform the oral agreement. The court held that as a result of the sale by appellees of appellant's products at about appellees' costs and without substantial gross profit, appellees incurred substantial losses during the period, and appellees' business credit became damaged and impaired, and appellees were unable, subsequent to April 25, 1953, to renew said prior business of bidding for military purchases.

We hold that the findings of fact by the trial court are clearly supported by the evidence and sustain a finding of estoppel. It is true that appellees did not entirely abandon their prior business, but it is not necessary under the circumstances of this case: It is clear that appellees in reliance on the oral contract materially changed their position, and that if the contract is not enforced, an unconscionable injury will result.

### Equal Dignities Rule

California Civil Code, § 2309 requires "that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." Hunt argues that this so-called "Equal Dignities Rule" requires written authority for Mr. Flynn, Hunt's District Manager, or Mr. Miller, Hunt's Sales Manager, to enter into the contract with appellees. Written authority was not shown. Appellees argue that appellant is estopped to rely upon the equal dignities rule. The chief case relied upon by appellant is E. K. Wood Lumber Co. v. Moore Mill & Lumber Co., 9 Cir., 1938, 97 F.2d 402, 409. This Court therein stated, in an opinion written by the author of the instant opinion, that:

"Appellant argues that appellee is estopped to assert that the agent had no written authority. We see no reason for applying a different rule in respect to this contention than that applicable where estoppel is claimed with respect to the statute of frauds proper. In the latter case it is necessary to show not only a change of position to the injury of the party asserting the estoppel, but also that there has been conduct on the part of the opposite party amounting to a representation that he will not avail himself of the statute to escape his agreement * * *."

However, as previously discussed, Monarco v. Lo Greco, 1950, 35 Cal.2d 621, 220 P.2d 737, later appears to have liberalized the requirements for a finding of estoppel to assert the statute of frauds, and concomitantly liberalized the estoppel requirements necessary when dealing with the equal dignities rule.

See also Berkey v. Halm, 101 Cal.App.2d 62, 224 P.2d 885.[5] We have heretofore held that the requisite elements are present for estoppel to assert the statute of frauds, and additionally hold that appellant is estopped to assert the equal dignities rule. Le Blond v. Wolfe, Cal., 1948, 83 Cal.App.2d 282, 188 P.2d 278, is in accord with the result we herein reach. The court therein treated the so-called statute of frauds code sections (Civil Code, § 1624 and Code of Civil Procedure, § 1973) and the equal dignities code section (Civil Code, § 2309) as being in the same category. Actually, discussion of Civil Code, § 2309 was unnecessary since the court held that the defendant was liable under an oral contract to buy, and it was immaterial to the defendant's liability whether, in a *later* escrow transaction, defendant's agent had written authority to bind defendant. But the court's analysis is pertinent to the instant case. See also Corporation of America v. Harris, 1935, 5 Cal.App.2d 452, 43 P.2d 307, and Jeppi v. Brockman Holding Co., 34 Cal.2d 11, 206 P.2d 847, 9 A.L.R.2d 1297.

Because we have found an estoppel to assert the equal dignities rule, we find it unnecessary to discuss the inapplicability of the rule based on appellees' argument that Mr. Flynn and Mr. Miller are executives of appellant. The same is true as to appellees' argument that Flynn had authority to make the agreement because such agreement is necessary or proper and usual in the ordinary course of business, for effecting the purpose of his agency as District Sales Manager.

## Damages

Appellant raises a host of objections on the subject of damages. Appellant argues in essence that the damages were so speculative that they could not be assessed; that is, they were prospective damages for a new enterprise involving contingent future bargains. Appellant also argues that gross profit figures were used in assessing damages, and that there was a failure of proof of the ability of appellees to perform the contract.

The California rule is that where it clearly appears that a party has suffered damage, a liberal rule should be applied in allowing a court or jury to determine the amount; and that, given proof of damage, uncertainty as to the exact amount is no reason for denying all recovery. The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery. California Lettuce Growers v. Union Sugar Company, 45 Cal.2d 474, 289 P.2d 785, 49 A.L.R. 2d 496; James v. Herbert, Cal.App., 1957, 309 P.2d 91; Mann v. Jackson, 141 Cal.App.2d 6, 296 P.2d 120. It is also clear that in arriving at the amount of such damages in a situation involving loss of profits, net profits are to be considered and not gross anticipated profits. West Coast Winery, Inc., v. Golden West Wineries, Inc., 69 Cal.App. 2d 166, 169, 158 P.2d 623, 625; Olcese v. Davis, 124 Cal.App.2d 58, 268 P.2d 175, 177.

In the instant case appellees had acted as the exclusive jobber of appellant to retail distributors on military bases for some sixteen months before appellant terminated the arrangement, and during such time appellees had substantially increased the sales of Hunt products to the various military establishments in Northern California. It was the understanding of the parties that of necessity the profits of appellees at the outset of the arrangement would be meager. At the trial appellees presented evidence as to business experience as to three of the nineteen commissary stores in Northern California. Appellees presented this evidence in order to show what amounts were sold, the gross profit and the fact that the

---

5. Language used in Georgia Peanut Co. v. Famo Products Co., 9 Cir., 96 F.2d 440, as to a requirement that one asserting the estoppel must have relied on some affirmative act, would appear to be modified by the Monarco v. Lo Greco case.

sales were increasing as time went along. The difference in gross profit at various times was also testified to by appellee Phillips. Appellee Phillips also testified that there was no relationship between the size of the orders he got from a particular military establishment and the cost of traveling expense to call on such establishment. Phillips also testified that his expenses were more or less static. We note particularly that appellees' partnership 1952 income tax return was admitted into evidence, which shows that during the year 1952 "Automobile and travel expenses" to be $6,576.82. Other expenses were listed in the tax return. It is also apparent from a reading of the transcript that appellees' sales of appellant's products were increasing rapidly at the time of the termination of the agreement and that gross profit was also rising. We hold that under the facts of the instant case, there was operating experience sufficient to permit a reasonable estimate of probable income and expense, and the trial court was justified in awarding damages for loss of prospective profits. Jegen v. Berger, 77 Cal. App.2d 1, 174 P.2d 489; Natural Soda Products Co. v. City of Los Angeles, 23 Cal.2d 193, 143 P.2d 12. Schmitt v. Continental-Diamond Fibre Co., 7 Cir., 116 F.2d 779, which appellant cites out of context, is clearly distinguishable. There plaintiff based its damages for breach of a sales agency contract on the mere showing of the amount of *defendant's* sales and an *assumption* that a certain percentage of such sales would have originated in plaintiff's district for the years in question. Other cases cited by appellant are distinguishable and bear no relation to the facts of the instant case. It is clear from a reading of the record that the trial judge was aware of the proper standards for assessment of damages and that there is no evidence that gross profit was the sole basis for determining the award. We likewise find against appellant's claim that appellees did not show that they were able to perform the agreement; rather, the evidence showed just the opposite.

Other points raised by appellant we have examined and find without merit.

Judgment affirmed in favor of appellees on their complaint, and remanded as to the judgment in favor of appellant on its cross-complaint for a determination by the trial court as to the proper amount of interest allowable on such judgment.